IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

VIRGINIA SNYDER,

       Plaintiff,

      v.                                 Civil Action No.1:07-CV-37

MICHAEL J. ASTRUE,
Commissioner of Social Security,

       Defendant.

## REPORT AND RECOMMENDATION
## SOCIAL SECURITY

### I.  Introduction

A.    <u>Background</u>

      Plaintiff, Virginia Snyder, (Claimant), filed her Complaint on March 15, 2007 seeking

Judicial review pursuant to 42 U.S.C. §§ 405(g) and 1381(c)(3) of an adverse decision by

Defendant, Commissioner of Social Security, (Commissioner).[1]  Commissioner filed his Answer

on July 12, 2007.[2]  Claimant filed her Motion for Summary Judgment on August 13, 2007.[3]

Commissioner filed his Motion for Summary Judgment on September 12, 2007.[4]

B.    <u>The Pleadings</u>

     1.    <u>Plaintiff's Memorandum In Support of Her Motion for Summary Judgment</u>

     2.    <u>Defendant's Brief In Support of His Motion For Summary Judgment</u>

---

[1] Docket No. 1.

[2] Docket No. 4.

[3] Docket No. 7.

[4] Docket No. 9.

C.    Recommendation

I recommend that:

1.    Claimant's Motion for Summary Judgment be GRANTED because although the ALJ complied with the procedures for evaluating Claimant's mental impairment, the ALJ failed to comply with the procedures for evaluating Claimant's obesity in steps three and four of the sequential analysis.  Accordingly, the Court, despite finding substantial evidence supports aspects of the ALJ's determination of Claimant's RFC and her ability to perform her past work, cannot determine whether the ALJ's decision, as a whole, is supported by substantial evidence.

2.    Commissioner's Motion for Summary Judgment be DENIED for the same reasons stated above.

## II.  Facts

A.    Procedural History

Claimant filed an application for Disability Insurance Benefits on March 30, 2005, alleging disability since March 2, 2003 stemming from petit mal seizures, hypertension, arthritis in hands and spine, carpal tunnel syndrome in both hands, and depression.  Her application was initially denied on June 27, 2005 and upon reconsideration on October 5, 2005.  Claimant requested a hearing before an Administrative Law Judge, ["ALJ"], and received a hearing on March 10, 2006.  On April 12, 2006, the ALJ issued a decision adverse to Claimant.  Claimant requested review by the Appeals Council but was denied.  Claimant filed this action, which proceeded as set forth above.

B.    Personal History

Claimant was 55-years-old on the date of the March 10, 2006 hearing before the ALJ.

Claimant completed eighth grade and later received her GED. Claimant has prior work experience as a sewing machine operator.

C.    Medical History

The following medical history is relevant to the time period during which the ALJ concluded Claimant was not under a disability: March 2, 2003 through June 30, 2003.[5]

**Miranda Rebrook, 6/17/05, (Tr. 122)**
Physical RFC Assessment
Additional Comments:
>    Allegations: Petit Mal Seizures, Hypertension, Arthritis in Hands and Spine, Carpal
>        Tunnel.
>    AOD: 3/2/03
>    DLI: 6/30/03
>    Medical in file is insufficient prior to DLI.
>    Credibility is not an issue.

**Miranda Rebrook, 6/17/05, (Tr. 130)**
Psychiatric Review Technique
Medical Dispositions: Insufficient evidence
Consultant's Notes:
>    Allegations: depression
>    AOD: 3/2/03
>    DLI: 6/30/03
>    Claim is insufficient prior to DLI.

**Dr. Gauri Pawar, M.D., 3/6/00, (Tr. 170)**
Patient's neurological exam is normal.
These brief episodes of confusion are unlikely to be strokes. Partial complex seizures cannot be ruled out. I have requested an EEG on this patient and B12 and thyroid function tests. I have not started her on any medications at this time. If the above tests are negative, I will consider doing a video/EEG monitoring to see if we can capture one of these episodes.

**John Brick, M.D., 4/28/00, (Tr. 172)**

---

[5] Claimant's disability insured status pursuant to 42 U.S.C. §§ 423(c) expired on June 30, 2003. Because Claimant is eligible for disability benefits only through the date of her insured status, the relevant time period for the purpose of establishing disability is March 2, 2003 through June 30, 2003. See 42 U.S.C. §§ 423(a)-(c); 20 C.F.R.§ 404.131; Johnson v. Barnhart, 434 F. 3d 650, 655 (4th Cir. 2005).

<u>Diagnosis</u>: Probable left temporal sharp waves.

<u>Clinical interpretation</u>: This EEG shows focal abnormalities over the left temporal regions during wakefulness and sleep. While the morphologic characteristics and disruption of these wave forms is perhaps a little reminiscent of the benign phenomenon known as wicket spikes, I'm inclined not to place this pattern within that group because of the associated slow wave activity. I am not, however, absolutely sure of this finding and, if clinically indicated, it may be worthwhile obtaining an ambulatory EEG in hopes that we could see more of these discharges and better clarify their nature.

**John Brick, M.D., 3/27/00, (Tr. 174)**

<u>Diagnosis</u>: Dysrhythmia grade II, left temporal; attempted sleep unsuccessful.

<u>Clinical interpretation</u>: This electroencephalography shows nonspecific abnormalities over the left temporal region during wakefulness. If a seizure disorder is suspected upon clinical grounds, it may be worthwhile obtaining a record during sleep in that interictal abnormalities are occasionally uncovered in sleep where they had been absent during wakefulness.

**Roger Lewis, M.D., 8/29/00, (Tr. 176)**

<u>Extremities</u>: The examination of the extremities reveals the shoulders show no point tenderness and no crepitations with a full ROM, the elbows show no swelling, no tenderness, no crepitations and a full ROM, there is full ROM of the hands/fingers without swelling or joint deformities, the hips show no tenderness, no crepitations, no swelling with full ROM, the knees show no tenderness, no swelling, no crepitations with a full ROM and there is no ankle swelling, no pitting edema and no foot deformity.

<u>Neurological system</u>: The examination of the neurological system reveals the patient is alert and oriented to time, place and person, the cranial nerves II through XII appear to be intact, the DTR's are normal and equally reactive bilaterally, there is good muscular coordination and strength bilaterally and there are no gross sensory deficits at this time.

<u>Diagnoses</u>: Headache, Migraine (unspecified) - Status: persistent.

**Roger Lewis, M.D., 9/26/00, (Tr. 180)**

<u>Diagnosis</u>:
    1. Headache. Migraine (unspecified).
    2. Bronchitis, Acute.

**Roger Lewis, M.D., 10/3/00, (Tr. 180)**

<u>Diagnosis</u>:
    1. Headache. Migraine (unspecified).
    2. Bronchitis, Acute? Atypical.

**Roger Lewis, M.D., 11/7/00 (Tr. 180)**

Diagnosis:

      1. Headache. Migraine (unspecified).

      2. Medication reaction

**Roger Lewis, 6/6/00, (Tr. 182)**

Heart reveals regular rate. Lungs are clear.

**Roger Lewis, 2/15/00, (Tr. 183)**

HEENT unremarkable. Heart reveals regular rate w/o murmurs. Lungs are clear to auscultation. Abdomen is soft, nontender. Feet show no trace of edema.

**Stan Morris, M.D., 1/12/00, (Tr. 184)**

Vitals in chart: HEENT, NC, AT, oral mucosa pink and moist. Neck supple. Thyroid supple w/o masses. Heart reveals regular rate and rhythm. Lungs are clear. Abdomen benign. Extrms reveal 2+ pre-tibial edema up to just below the knee with chronic changes of the skin. Her left wrist is tender over the dorsum of the wrist. Has regular ROM except when patient is paying attention to it there is some distractive changes and pain.

Assessment: Peripheral edema; Menopause symptoms; left wrist prob ganglionic cyst.

**David Tuel, M.D., 2/18/03, (Tr 186)**

On exam normal looking hand. Full ROM. She does have pain on direct palpitation of the CMC joints bilaterally. She also has some subjective complaints of ulnar styloid pain but nothing but some mild tenderness on palpatation. EMGs were normal. X-rays were normal.

Assessment: early synovitis of both the wrist and CMC joints.

**Dr. Savopoulos, M.D., 10/20/03, (Tr. 187)**

1. Peripheral edema with elevated BP, improved. Continue Diazide one po qd.

2. Fatigue. D/C Lexapro and start prozac 20 mg qd. Will recheck in 1 month.

3. Externa otitis, chronic, which may be fungal in origin. There also appears to be atopic component of this. Will try Lotrisone lotion 3-4 drops to each ear bid. Patient to watch for increased irritation.

4. Skin rash which today seems to be lichen planus. Will use Lidex ointment bid. May need Erythronycin. RV in 1 month.

**Dr. Savapolous, M.D., 9/22/03, (Tr. 188)**

1. Peripheral edema now worse off Diazide. Will restart Diazide a one every other day for the next 4 doses and then go to every day. She may use aspirin for the headaches if they restart and if they become more of a problem than that she will call. She will continue to work on weight

loss.
2. Elevated BP.  Will reassess in one month.
3. Depression with anxiety.  Restart Lexapro 10 mg qd.

**Dr. Savapolous, M.D., 8/11/03, (Tr. 190)**
1. Peripheral edema which is improved by BP has not.  BP check in 2 weeks and if still elevated will need to change medication.
2. Depression with memory changes.  Continue Lexapro as it seems to be starting to help.  Will reassess in about 6 weeks.

**Dr. Savapolous, M.D., 7/3/03, (Tr. 191)**
1. Depression, persisting with fatigue.  Encouraged patient to be compliant with her Vitamin B complex qd.  She is to increase her exercises with walking each day.  Will start Lexapro 10 mg qd and if symptoms are affective after 4 weeks she will get the Rx filled.
2. Renal Lithiasis with patient having some symptoms off and on but they seem to pass will check BP as above. Recheck in 6 weeks.

**Dr. Savapolous, M.D., 5/20/03, (Tr. 192)**
1. Depression
2. Anxiety both improved but with side effects of sedation on Paxil.  Will change to Zoloft 25 mg qd x 8 days then 50 mg qd. Will need to watch for any increased agitation or sleep disturbance.  BP has improved with this.  Will try to obtain the results of the EEG that was done 10 days ago.

**Dr. Savapolous, M.D., 3/25/03, (Tr. 193)**
1. Depression, persisting for at least 6 months.  Start Paxil CR 12.5 mg qd and recheck in 6 weeks.  Patient advised if she has any side effects or her symptoms are not improving but worsening she will call the office.
2. Fatigue, likely secondary to the above depression. Patient has normal blood work.
3. Complex partial seizures.  Will obtain records of EEG in Morgantown.

**Dr. Savapolous, M.D., 12/30/02, (Tr. 195)**
A/P: Right hand pain with probably carpal tunnel syndrome.  Check blood sugar, B12 and TSH and lipid profile.  Patient to use carpal tunnel splint.  May need EMG.

**Dr. Savapolous, M.D., 9/25/01, (Tr. 196)**
A/P: Left lateral epicondylitis. Patient desires to hold on the injection and will continue PT for now for another 2 weeks.  RV in about 6 weeks.

**Dr. Savapolous, M.D., 8/17/01, (Tr. 197)**
1. Left arm pain, likely related to cervical disc derangement.  Will check x-ray and start PT.  Re-

ck in 5 wk,
2. Vitamin B12 deficiency.  Vitamin B12 1000 IM now and each wk for 3 weeks and then each month.

**Thomas Lauderman, 9/26/05, (Tr. 202)**
Physical RFC Assessment
Additional Comments:
> Alleges disability due to petite mal seizures, hypertension, arthritis in hand, carpal tunnel syndrome and depression.
> AOD: 3/2/03
> DLI: 6/30/03
> Medical in file is insufficient prior to DLI.
> Credibility is not an issue.

**Joseph Kuzniar, 9/26/05, (Tr. 212)**
Psychiatric Review Technique
Medical Dispositions: insufficient evidence
Categories upon which the medical disposition is based: affective disorders
Consultant's Notes:
> Claimant alleges disability due to depression and physical impairments.
> AOD: 3/2/03
> DLI: 6/30/03
> Medical evidence is insufficient prior to DLI.
> Credibility is not an issue.

**Dr. Savapolous, M.D., 11/8/05, (Tr. 226)**
1. Fatigue, persisting and now with increase weight gain.  Will D/C Prozac and continue Wellbutrin.  Encouraged to increase exercise.
2.  Edema which is very mild now. Continue Lasix.  B12 injection. Advised to read several chapters in the book of Psalms each day.  RV in 2 months.

**Dr. Savapolous, M.D., 10/6/05, (Tr. 228)**
1. Fatigue, overall persisting but is not at all worsening.  This has been present for some time and work up has been negative.
2. Edema which is improved and staying improved although the patient is not exercising.  Encouraged patient to start exercising at least walking although she states she is not sure she would like to do that.  Continue Wellbutrin XL 300mg qd and will add Prozac 10 mg qd to see if this helps with her energy levels.  Will reassess in about a month.  She will try to see if there would be any possibility with the husband accepting any marriage counseling.

**Dr. Savapolous, M.D., 9/12/05, (Tr. 229)**

1. Edema which seems to be improved.  Continue lasix 20 mg qd.  Continue good activity level.
2. Depression with anxiety.  Will continue Wellbutrin XL 300mg qd and add Lexapro 5 gm qd.
Recheck in about 3 ½ weeks.

**Dr. Savapolous, M.D., 5/5/05, (Tr. 230)**
A/P: Edema, markedly improved.  Continue Lasix and hopefully as weight loss continues her
fluid will continue to improve.  Continue Wellbutrin XL 300mg qd. RV in 4 months.  She does
not want any further mammograms or exams at this time.

**Dr. Savapolous, M.D., 4/4/05, (Tr. 231)**
1. Edema, overall improved.  Continue Lasix 20 mg qd.
2. Depression with irritability, worse. She is also continuing to gain weight.  Will use Wllbutrin
XL 150mg qd for 2 weeks then at that point stop the Prozac and go to Wellbutrin XL 300mg qd.
RV in 4 weeks.

**Dr. Savapolous, M.D., 12/9/04, (Tr. 232)**
1. Edema which appears improved especially with Lasix.  Will continue that 20mg qd.
2. Chest pressure.  Will need GXT.
3.  Depression and fatigue which is chronic.  We may need to change her Prozac if this persists.
She may be better with an increased dose as well.

**Dr. Savapolous, M.D., 6/7/04, (Tr. 233)**
1. Edema improved. Continue Diazide 37.5mg/25mg one qd. Encouraged about walking and to
try to be consistent with that qd.
2. Depression, improved.  Continue Prozac 20 mg qd.
3. Memory loss and fatigue with possible petite mal seizures.  Will try B12 injections 1000mcg q
week c 2 weeks then q month.  If after several months patient is not noticing any difference will
change back to po therapy.  RV in 6 months.

**Dr. Savapolous, M.D., 1/8/04, (Tr. 235)**
1. Peripheral edema, resolved.  Will continue Diazide for now and patient will continue to drink
adequate amounts of water.  She is encouraged about increasing exercise especially using the
treadmill that she has.
2. Depression with anxiety, markedly improved.  Continue Prozax 20 mg qd.
3.  Health maintenance.  Mammogram ordered although patient does not want any further exams.

**Dr. Savapolous, M.D., 12/20/05, (Tr. 236)**
Mental Impairment Questionnaire (RFC and Listings)
-Identify your patient's signs and symptoms: poor memory, social withdrawal or isolation,
personality change, mood disturbance, emotional lability, anhedonia or pervasive loss of
interests, difficulty thinking or concentrating, sleep disturbance, oddities of though, perception,

speech or behavior, social withdrawal or isolation.

-Describe the clinical findings including results of mental status examinations which demonstrate the severity of your patient's mental impairment and symptoms: MSE with no dementia;        Moderate depression with social isolation.

-Is your patient a malingerer: No

-Are your patient's impairments reasonably consistent with the symptoms and functional limitations described in this evaluation? Yes

-Treatment and response: Antidepressants.

-Describe the side effects of medications which may have implications for working: fatigue, increased sedation.

-Prognosis: fair

-Has your patient's impairment lasted or can it be expected to last at least 12 months? Yes

-Approximately when did it begin? 99

-Does the psychiatric condition exacerbate your patient's experience of pain or any other physical symptom? Yes. Worsened HA's.

-On average, how often do you anticipate that your patient's impairments or treatment would cause your patient to be absent from work? More than three times a month.

-Mental abilities to do unskilled work:

    -Remember work-like procedures: fair

    -Understand and remember very short and simple instructions: good

    -Carry out very short and simply instructions: good

    -Maintain attention for two hour segments: fair

    -Maintain regular attendance and be punctual within customary, usually strict, tolerances: fair

    -Sustain an ordinary routine without special supervision: fair

    -Work in coordination with or proximity to others without being unduly distracted: poor or none

    -Make simple work related decisions: fair

    -Complete a normal workday and workweek without interruptions from psychologically based symptoms: fair

    -Perform at a consistent pace without an unreasonable number and length of rest periods: fair

    -Ask simple questions or request assistance: good

    -Accept instructions and respond appropriately to criticism from supervisors: poor or none

    -Get along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes: fair

    -Respond appropriately to changes in a routine work setting: fair

    -Deal with normal work stress: poor or none

    -Be aware of normal hazards and take appropriate precautions: poor or none

-Mental abilities and aptitudes needed to do semiskilled and skilled work

-Understand and remember detailed instructions: fair
-Carry out detailed instructions: fair
-Set realistic goals or make plans independently of others: fair
-Deal with stress of semiskilled and skilled work: poor or none
-Mental abilities and aptitudes needed to do particular types of jobs
-Interact appropriately with the general public: fair
-Adhere to basic standards of neatness and cleanliness: poor or none
-Travel in unfamiliar place: fair
-Use public transportation: fair
-Indicate to what degree the following functional limitations exist as a result of your patient's mental impairments:
-Restriction of activities of daily living: slight
-Difficulties in maintaining social functioning: marked
-Deficiencies of concentration, persistence, pace resulting in failure to complete tasks in a timely manner (in work settings or elsewhere): moderate
-Episodes of deterioration or decompensation in work or work-like settings which cause the individual to withdraw from that situation or to experience exacerbation of signs and symptoms which may include deterioration of adaptive behaviors: three
-Can your patient manage benefits in her or her own best interest? Yes
-Is your patient currently abusing alcohol or using illegal drugs? No

**Adriana Palada, M.D., 5.12.03, (Tr. 267)**
Interpretation: This was an unremarkable 24 hour ambulatory adult EEG monitoring.

D.      Testimonial Evidence

Testimony was taken at the March 10, 2006 hearing.  The following portions of the

testimony are relevant to the disposition of the case.

[EXAMINATION OF CLAIMANT BY ADMINISTRATIVE LAW JUDGE]  (Tr. 32)

Q       Okay.  Now, you indicate you became disabled about three years ago roughly.

What's been the main problem with your ability to work since then?

A       I don't like being around people.  I get really upset.  I can't stand very long.  My

back gives me a lot of problems and I can't stand.  I have to sit down.  And I can't sit very long.

I've got arthritis in my hands real bad.  I can't use them.  I can't bend my knees.  If I get down

on the floor you have to - - I have to get a hold of something to pull myself up because I can't get up.

Q    What kind of treatment are you getting for these conditions?

A    They said that only thing they could do is give me pain medicine, which the stuff they gave me was really upset my stomach, so I try to take like the coated, the maximum strength on those.

Q    So, what do you take for your back or knees or hands?

A    The back and body for Bayer.  They gave me pain pills but they - - my stomach.  I get you know - - my stomach gets upset and cramps in it so I don't take them unless I'm really, really bad.  I try to take the maximum strength Bayer aspirin.  It's like 1,000 milligrams.

Q    Okay.  Does that relieve the pain?

A    It helps.  It don't take it away but it does help.  My hands is not as bad if I don't use them.  If I use them like on my computer I have - - like I try to type one sentence and it gets to hurting really bad and I can't do anymore with them.  Same way with trying to wash dishes or cook.  If I have heavy pans my husband has to move them.  I can't do it because I drop them.

Q    And how far can you walk at a stretch?  Any problems with walking?

A    Well, when I go grocery shopping I have to have a cart like that even if I'm getting one or two things to hold onto because I can't walk through the store anymore.  My back just gives out on me.  And my legs get to hurting.  And my knees.

Q    How long has this been the case?

A    About two years now it's gotten this bad.

Q     And when did your hands start getting bad?

A     They started back in - - it was 2000 or 2001.  And they just are gradually getting worse all the time.

*          *          *

Q     Did they give you any splints or anything to wear?

A     Yeah.  I have those for both hands.

Q     Do you wear those?

A     When they get to hurting me bad I do but you can't do anything with them on. Just like washing your dishes or something you have to have them off.  Same way with driving. They keep your hands kind of stiff.  You can't use the steering wheel or anything or picking up dishes or anything else with the things on.  But like when I go to bed at night I wear them.

Q     Any problems with sitting?  I mean, how long can you sit at a stretch?

A     Well, not that long either.  We go to the movies once in a while.  It's like an hour and a half movie.  I just sit and I turn like sideways and then turn the other way like that because I can sit.  Then when I go to get up I have to get a hold of the seat in front of me in order to pull myself up.

Q     So, if you're able to move around in the seat you can sit through an hour and a half movie but then you got to pull yourself up?

A     Yeah.  It gets so bad like it just feels like your back's out of place and - -

Q     Um-hum.

A     - - is you know, like somebody's stabbing you or something.

Q     How long can you stand at a stretch like at a sink or a stove or something like

that?

A    Maybe 10 minutes if that.  I go to wash dishes I usually do two or three things and go sit down.  Then I go back and do a few more like that the same way.

*        *        *

Q    Um-hum.  Can you use a knife and fork okay?

A    No.  Like peeling potatoes I usually try to get them in a can or something like that or just peel a couple at a time because by bending my hands to hold the knife and things is what's really bad.

Q    Um-hum.

A    It gets just like something's stabbing in your fingers and stuff and I drop whatever I'm holding.

Q    Can you hold a cup of coffee or glass of milk?

A    Yeah, I can hold a glass.  But not - - you know, I don't just hold it.  I just take a drink and set it back down.

Q    Now, are you getting treated for seizures or did they stop that?

A    No.  With the seizures Dr. Savopolous  has found it brings them on more if I get upset.  If I can - - if I stay calm - - he's got me on the medicine.  He says it keeps my blood pressure down.  If I get upset my blood pressure goes up and it brings them on more frequent. But he said if he can keep it down because my blood pressure shot up - - it's been - - I guess it was in 2000.  That's where he come to that conclusion he said because when my blood pressure went up I had a stroke and they took me into the hospital.  That's when they sent me over and had the test done and said that's where I was having the seizures.  Said I could have them and

I'm not - - I don't even realize it.  I drove - -

Q        When - -

A        - - like to - - drove to Morgantown and I know how to get around Morgantown and my mother was with me and I was up at the road and I stopped.  I didn't know where I was.  I asked her.  She said she didn't know either but I carry little notes with me if I'm going someplace where I'm supposed to be going or whatever.  And especially if I'm by myself.  And then I sat and focused for a while and look around at the different signs until I realize where I'm at and then I can go again.

Q        Um-hum.

A        But that's I guess how they do.

Q        When was the last time you had some kind of a seizure?

A        It's been maybe three, four months ago that I had one like that where I just forgot everything.  Now, the small ones is like I'll be talking to somebody and then it's just like my mind goes blank and I can't tell you what I'm talking about or - - it just - - it gets all jumbled up.  I have those every little bit.

Q        How often do those occur?

A        At least every week.

Q        And what do you do when they come on?

A        I just stop what I'm doing.  Like especially if I'm trying to talk and it just don't come out right and until I get my bearings and then keep on talking.

Q        And how long does that last?

A        Some of them last a few minutes.  Some of them a little bit longer.  Different

people saw me at different times.  They'd sitting there and my husband would tell me he just told me something and I said you didn't tell me nothing.  I don't remember.  Like it just - - it's just gone.  Just like if he told me something I did and I didn't do it but he said I did do it.  To me I don't remember doing it.

*          *          *

Q      So, you have a driver's license?

A      Yes.  Yeah.  I can drive okay.  I don't - - it doesn't seem to affect my driving.  I know what I'm doing and how to handle the car but I don't go that far and I don't drive usually by myself if I go somewhere unless it is like six-mile down the road or something to get groceries or something and back.  But most of the time I go with my husband when he gets home.  And if I don't have to I don't leave my house.  I just - - I don't like to be out around nobody.

*          *          *

Q      Do you spend a lot of time watching TV or reading?

A      I don't read either.  I don't like to read.  I watch some TV but not much.  I've got some games that my daughter-in-law went and downloaded on my computer like where I play once in a while but that's about it.

Q      What do you do on the computer?

A      Play games.

Q      What games?

A      They have like dominoes on there.

Q      So, you don't play those computer games - -

15

A      No.

Q      - - like those things that kids play - -

A      No.

Q      - - a lot?

A      I like - - I got dominoes and I got - - it's solitaire.  Something like that I like to play.  Them other things are - - I wouldn't understand how to do them if I had them.

*          *          *

ALJ      Okay.  Let me pull up the earnings record.  Now, who's John Zeigler?  That's the last place you worked and - -

CLMT      He has - -

ALJ      - - it looks like you worked there in 2004.

CLMT      Yeah, he called me a couple times.  I run - -

ATTY      Was it - -

CLMT      I drove - - they got blood for the Red Cross at the hospital and he asked me if I could pick it up and take it down to the Red Cross place like that for them when they're short handed or something like that for driving my car.  I stopped there at the hospital and I would get these little tubes of blood and - - in a little box.  I'd just take it down and give it to the Red Cross people and go back home.

ALJ      Okay.  Because - - and how - - was that a full-time job?

CLMT      No, that just whenever he didn't have anybody else to - -

ALJ      Because you did - - it looks like you did that in 2003 and 2004.

CLMT      Yeah.  Just whenever he didn't have - - if he had - - his people was out

with other patients I guess or something and he didn't have a driver. He just asked me if I would

do that. That was about it. Usually my mother went with me whenever - -

ATTY          [INAUDIBLE}

CLMT:          - - I done them things in case I had any problems.

Q          It looks like your last full-time job before that is Handy Girl - -

A          Sewing plant, yeah.

Q          - - Sewing plant. East Berlin, Pennsylvania. Or at least that's where the checks

are made.

A          Yeah.

Q          And how long - -

A          It was in Oakland, Maryland.

Q          How long did you work there?

A          I can't remember. It was two years, three years. Something like that.

Q          Well, actually it's more than three but - - maybe three and a half or four.

A          It might have been somewhere around there. I can't remember - -

Q          Yeah.

A           - - for sure.

Q          And what did you do for them?

A          Just run a sewing machine. Where you sewed a piece of material together. They

have - - you had different jobs. You know, sewing down - - like down your side seams or in the

backs of whatever it was.

Q          What's the most you had to lift doing that work?

A       Maybe five pound if that. They had people bring your material in and lay it down on one side. All you did was pick up two pieces of material and run it over the machine and lay it on - Q       Put it on the - -

A       - - the other side.

Q       - - other side.

A       Yeah. And tie it up - -

Q       And then - -

A       - - other people come pick it up.

Q       And then somebody else comes and picks it up.

A       Yeah.

Q       And I take it you're sitting all day at a machine?

A       Yeah. You just turn from one side to the other back and forth running a machine. There I'd get up maybe every hour like that. I'd get a hold of my machine to lift my own self up. Go to the bathroom, back - - didn't like it too well but it was either that or I wasn't working because I couldn't sit there any longer.

Q       Um-hum.

A       Even with the moving - - the turning back and forth I couldn't do anymore.

*               *               *

[EXAMINATION OF VOCATIONAL EXPERT BY ALJ]  (Tr. 51)

Q       Okay. Mr. Bell, could you please assess the claimant's past work by exertional level, skill level and any transferability of skills and how it's generally performed in the national economy?

18

A       Yes, Your Honor.  The work as a sewing machine operator joiner and seamer is light and semiskilled and there would not be any transferable skills.

Q       No transfer to sedentary work?

A       No, sir.

Q       Okay.  Let me give you a hypothetical question.  If we assume a person of the same age, education and work experience as the claimant.  Assume a person who's able to do light work as that's defined in the commissioner's regulations but assume the person should have no exposure to significant workplace hazards like heights or dangerous moving machinery.  And the person should be able to change position briefly and by briefly I mean just for a minute or two at least every hour.  Would such a person be able to do the past job as a sewing machine operator?

A       That hypothetical I don't believe would preclude that.  I wouldn't consider that a dangerous machinery.

Q       The sewing machine's not generally a dangerous machine?

A       No, sir.

                        *                  *                  *

Q       And is your testimony consistent with the DOT?

A       I believe that it is.

Q       And how many days if any can a person miss work and still do these kinds of jobs?

A       If the person's going to miss more than two days per month I believe they would attempt to have that corrected and if not remedied then the supervisory personnel would

terminate their employment.

Q       So - -

A       More than two days per month.

Q       More - - up to two days a month is probably satisfactory?

A       Yes.

E.      <u>Lifestyle Evidence</u>

The following evidence concerning the Claimant's lifestyle was obtained at the hearing and through medical records.  The information is included in the report to demonstrate how the Claimant's alleged impairments affect her daily life.

- Wears splints on both hands at night.  (Tr. 34)

- Goes to movies maybe once a week; moves around in seat.  (Tr. 34)

- Can wash 2-3 dishes at time and then must sit down.  (Tr. 35).

- Can carry a 10 lb bag of potatoes.  (Tr. 35)

- Eats out most of the time.  (Tr. 37, 43)

- Visits with grandchildren at her house.  (Tr. 37)

- Sits on back porch with dog and pets dog.  (Tr. 40)

- Drives to grocery store when she has to.  (Tr. 42)

- Cooks spaghetti and frozen food.  (Tr. 43)

- Rents videos.  (Tr. 44)

- Watches some TV.  (Tr. 44)

- Plays games on computer once in a while.  (Tr. 44)

- Transported blood for Red Cross in 2003 and 2004.  (Tr. 46-47)

• Is 5'6" tall and weighs 232 pounds.  (Tr. 162)

### III.  The Motions for Summary Judgment

A.    Contentions of the Parties

Claimant alleges the ALJ 1) failed to follow the regulatory requirements for evaluation of her mental impairment, 2) failed to properly incorporate her obesity into his analysis, 3) erroneously assessed her limitations and RFC, and 4)  erroneously concluded she was capable of performing her past work as a sewing machine operator.  Commissioner responds the ALJ properly evaluated Claimant's mental impairments, properly considered her obesity, properly determined her limitations and RFC, and properly concluded Claimant was capable of performing her past relevant work.

B.    The Standards.

1.    Summary Judgment.  Summary judgment is appropriate if  "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show there is no genuine issue as to material fact and the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 569(c).  The party seeking summary judgment bears the initial burden of showing the absence of any issues of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).  All inferences must be viewed in the light most favorable to the party opposing the motion.  Matsushita Elec.  Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).  However, "a party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials of [the] pleading, but...must set forth specific facts showing that there is a genuine issue for trial."  Anderson v.  Liberty Lobby, Inc., 477 U.S. 242, 256 (1986).

2.    Judicial Review.  Only a final determination of the Commissioner may receive

judicial review.  See, 42 U.S.C. §§ 405(g), (h); Adams v. Heckler, 799 F.2d 131,133 (4th Cir. 1986).

3.      Social Security - Medically Determinable Impairment - Burden. Claimant bears the burden of showing that he has a medically determinable impairment that is so severe that it prevents him from engaging in any substantial gainful activity that exists in the national economy.  42 U.S.C. §§ 423(d)(1), (d)(2)(A); Heckler v. Campbell, 461 U.S. 458, 460 (1983).

4.      Social Security - Medically Determinable Impairment.  The Social Security Act requires that an impairment, physical or mental, be demonstrated by medically acceptable clinical or laboratory diagnostic techniques.  42 U.S.C. §§ 423(d)(1), (3); Throckmorton v. U.S. Dep't of Health and Human Servs., 932 F.2d 295, 297 n.1 (4th Cir. 1990); 20 C.F.R. §§ 404.1508, 416.908.

5.      Disability Prior to Expiration of Insured Status- Burden.  In order to receive disability insurance benefits, an applicant must establish that he was disabled before the expiration of his insured status.  Highland v. Apfel, 149 F.3d 873, 876 (8th Cir. 1998) (citing 42 U.S.C. §§ 416(I), 423(c); Stephens v. Shalala, 46 F.3d 37, 39 (8th Cir.1995)).

6.      Social Security - Standard of Review.  It is the duty of the ALJ, not the courts, to make findings of fact and to resolve conflicts in the evidence.  The scope of review is limited to determining whether the findings of the Secretary are supported by substantial evidence and whether the correct law was applied, not to substitute the Court's judgment for that of the Secretary.  Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990).

7.      Social Security - Scope of Review - Weight Given to Relevant Evidence.  The Court must address whether the ALJ has analyzed all of the relevant evidence and sufficiently

explained his rationale in crediting certain evidence in conducting the "substantial evidence inquiry." Milburn Colliery Co. v. Hicks, 138 F.3d 524, 528 (4th Cir. 1998). The Court cannot determine if findings are unsupported by substantial evidence unless the Secretary explicitly indicates the weight given to all of the relevant evidence. Gordon v. Schweiker, 725 F.2d 231, 235-36 (4th Cir. 1984).

        8.     Social Security - Substantial Evidence - Defined.  Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Substantial evidence consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance.  Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996) (citations omitted).

        9.     Social Security - Sequential Analysis.  To determine whether Claimant is disabled, the Secretary must follow the sequential analysis in 20 C.F.R. §§ 404.1520, 416.920, and determine: 1) whether claimant is currently employed, 2) whether she has a severe impairment, 3) whether her impairment meets or equals one listed by the Secretary, 4) whether the claimant can perform her past work; and 5) whether the claimant is capable of performing any work in the national economy.  Once claimant satisfies Steps One and Two, she will automatically be found disabled if she suffers from a listed impairment.  If the claimant does not have listed impairments but cannot perform his past work, the burden shifts to the Secretary to show that the claimant can perform some other job.  Rhoderick v. Heckler, 737 F.2d 714-15 (7th Cir. 1984).

C.     Discussion

        1.     Whether the ALJ Failed to Follow the Proper Procedure For Evaluating Mental Impairments.

Claimant alleges the ALJ failed to follow the regulatory requirements set forth in 20

C.F.R. § 404.1520(a) and SSR 96-8p for the evaluation of mental impairments.  Commissioner

argues the ALJ properly analyzed the evidence of Claimant's mental impairments.

Claimant correctly alleges 20 C.F.R. § 404.1520a requires a special technique be

followed when evaluating a claimant's mental impairments.  Under this Regulation, if the ALJ

determines a claimant has a medically determinable mental impairment, the ALJ must specify

the "symptoms, signs, and laboratory findings that substantiate the presence of the

impairment(s)" and rate the degree of functional limitation imposed by the impairment.  20

C.F.R. §§ 404.1520a(b)-(e).  The evaluation of the functional limitation imposed by the

impairment should consider four functional areas: "activities of daily living; social functioning;

concentration, persistence, or pace; and episodes of decompensation."  20 C.F.R. §

404.1520a(c)(3).  With these considerations in mind, the ALJ should then determine if the

mental impairment is severe.  20 C.F.R. § 404.1520a(d).  Only if the impairment is severe should

the ALJ evaluate whether it meets one of the medical Listings in the Regulations.  20 C.F.R. §

404.1520a(d)(2).  The ALJ's decision must "document application of the technique" and must

"include a specific finding as to the degree of limitation in each of the [four] functional areas."

Id. at § 404.1520a(e)(2).

The Court finds the ALJ in the present case complied with the procedures set forth above

and furthermore finds the ALJ's conclusions are supported by substantial evidence.  The ALJ

complied with step one of the procedure by detailing his finding Claimant had a medically

determinable mental impairment of "mild anxiety/depression," and by detailing his reliance on

Dr. Savapoulos' treatment records as the basis for his finding.  (Tr. 17-20, 192, 193, 235).  As

required in step two of the procedure, the ALJ concluded Claimant's impairment imposed "[no]

more than mild, if any" limitation upon Claimant's daily activities, social functioning or concentration, persistence or pace" and resulted in no episodes of decompensation. See 20 C.F.R. § 404.1520a(e)(2). Such a finding is supported by the absence of evidence in the record of limitations arising from Claimant's depression, by two Psychiatric Review Technique reports dated 2005 which state the medical evidence is insufficient prior to June 30, 2003, and by Dr. Lewis' records from 2000 which diagnosis Claimant with only a migraine headache. (Tr. 130, 176-183, 212). Although Dr. Savapoulos' "Mental Impairment Questionnaire" detailed limitations arising from Claimant's mental impairments, the report was completed more than two years after the relevant time period and is contradicted by his reports of Claimant's improving condition in early and late 2004. (Tr. 236). As required in step three of the procedure, the ALJ determined Claimant's mental impairment was not independently severe, but was merely one of several impairments that combined to significantly limited Claimant's ability to perform basic work functions. (Tr. 17). Because the ALJ concluded the impairment was not independently severe, the ALJ did not have a duty to determine if the impairment, by itself, met or equaled a Listing. 20 C.F.R. § 404.1520a(d)(2). He merely had the duty to consider whether Claimant's impairments, in combination, met or equaled a Listing. The ALJ complied with this duty by analyzing Claimant's anxiety/depression and concluding it did not rise to the level of severity to meet a Listing. (Tr. 17-20).

The Court is not persuaded by Claimant's argument that the ALJ's failure to attach a Psychiatric Review Technique Form, ["PRTF"], to his decision, as allegedly required by 20 C.F.R. § 404.1520a, mandates remand. First, the Regulation requires the attachment of a "standard document" such as a PRTF only in cases where the ALJ concludes the mental

impairment is severe. 20 C.F.R. §§ 404.1520a(d)(2), (e).   The ALJ did not make such a conclusion in this case.  Additionally, although Circuit Courts outside of the Fourth Circuit have held remand is warranted in cases where the ALJ fails to attach the PRTF and where there is a "colorable claim of mental impairment," see Guitierrez v. Apfel, 199 F.3d 1048, 1051 (9th Cir. 2000), the District of Maryland has held no such form is required where the form "would add nothing to the process."  Baker v. Chater, 957 F. Supp 75, 79-80 (D.Md. 2003).  In the present case, the ALJ concluded Claimant's anxiety/depression was not severe, by itself, and barely rose to the level of a severe impairment when combined with other impairments.  Accordingly, attaching a PRTF would have "added nothing" to the process and therefore was not required. See Baker, 957 F. Supp. at 79-80.

       2.      Whether the ALJ Failed to Properly Consider Claimant's Obesity

Claimant alleges the ALJ failed to properly consider Claimant's obesity in step three (Listings) and four (determining RFC and ability to perform past relevant work) of the sequential analysis and failed to consider the impact of Claimant's obesity on her other impairments. Commissioner contends the evidence did not reveal any limitations stemming from her obesity and that the ALJ's hypothetical properly accommodated Claimant's obesity.

Social Security Regulation 02-1p sets forth the guidelines for the evaluation of obesity in disability claims.  SSR 02-1p (2002).  A claimant's obesity is "severe" when, "alone or in combination with another medically determinable physical or mental impairment(s), it significantly limits an individual's physical or mental ability to do basic work activities."  Id. Because obesity is not a  separately listed impairment, a claimant with obesity meets the requirements of a Listing if "there is an impairment that, in combination with obesity, meets the

requirements of a listing."  Id.  Equivalence may result "if an individual has multiple impairments, including obesity, no one of which meets or equals the requirements of the listings, but the combination of impairments is equivalent in severity to a listed impairment."  Id.  In steps four and five of the sequential analysis, "an assessment should be made of the effect obesity has upon the individual's ability to perform routine movement and necessary physical activity within the work environment." Id.  Because "the combined effects of obesity with musculoskeletal impairments can be greater than the effects of each of the impairments considered separately," the ALJ must be sure to consider "any additional and cumulative effects of obesity" throughout the sequential analysis.  20 C.F.R. Pt. 404, Subpt. P, App. 1 (2002).

At step two of the analysis, the ALJ found Claimant suffered from "moderate obesity" that was "severe" -  significantly limited Claimant's physical or mental ability to do basic work activities - when combined with other impairments.  (Tr. 17).  This finding triggered the ALJ's duty to thereafter consider the impact of Claimant's obesity, independently and in combination with other impairments, throughout the remainder of his analysis.[6]  SSR 02-1p; 20 C.F.R. Pt. 404, Subpt. P, App. 1.  The Court finds the ALJ failed to perform this duty at step three and four of the analysis.

At step three of the analysis, the ALJ stated he "appropriately evaluated medical and

---

[6] The Court notes it was the ALJ, not Claimant, who made relevant the issue of Claimant's obesity.  Claimant never alleged obesity as an impairment or source of limitation when she filed her application for benefits (Tr. 80), requested reconsideration (Tr. 64), or completed her disability report (Tr. 102, 112).  Similarly, Claimant made no mention of her obesity at the hearing.  Lastly, there is minimal evidence in Claimant's medical file of her obesity or its impact on her ability to perform basic work activities.  Nevertheless, the ALJ found Claimant's obesity gave rise to a severe impairment when combined with her other impairments and by doing so became obligated to adhere to the procedures outlined in SSR 02-1p for evaluating Claimant's obesity.

other evidence pertaining to Claimant's medically determinable impairments in conjunction with all relevant severity criteria" within the applicable Listings and concluded Claimant "had no medically determinable impairments, whether considered individually or in combination" that met a Listing. (Tr. 17). Without any mention of Claimant's obesity, the Court cannot ensure the ALJ considered Claimant's obesity, alone and in combination with other impairments, in his analysis of the Listings. Accordingly, the case must be remanded for further consideration consistent with the guidelines set forth in SSR 02-1p.

Similarly, at step four, the ALJ concluded Claimant retained the ability to perform a range of work that "entails no exposure to significant workplace hazards (e.g. dangerous moving machinery, unprotected heights, etc.); affords opportunity for brief, one-to-two minute position changes at least every hour; and accommodates up to one unscheduled workday absence per month." (Tr. 17). The ALJ then concluded Claimant was capable of performing her past work as a sewing machine operator. In coming to his conclusion, the ALJ "considered all of Claimant's alleged symptoms . . . opinion evidence . . . [and] the evidence of record" and found although Claimant had an impairment capable of causing some of her alleged symptoms, Claimant's statements concerning the intensity, duration and limiting effects of her symptoms were not entirely credible. (Tr. 17, 18). Additionally, the ALJ relied on the hearing testimony of Claimant and the vocational expert. (Tr. 21). The Court cannot determine from the ALJ's words whether he properly considered the impact of Claimant's obesity on her work-related abilities (such as her ability to stand, sit, manipulate objects, and focus), and the impact of her obesity on her other impairments, such as depression, as required by SSR 02-1p. Although evidence in the record of Claimant's obesity is extremely slight, the evidence does make Claimant's obesity

relevant to her fatigue and depression. (Tr. 226, 231). Because it is not the role of the Court to weigh the evidence, the case must be remanded for further consideration consistent with the guidelines set forth in SSR 02-1p and 20 C.F.R. Pt. 404, Subpt. P, App. 1; <u>see</u> <u>Craig</u>, 76 F.3d at 589.

      3.     <u>Whether the ALJ Erroneously Assessed Claimant's Residual Functional Capacity</u>.

Claimant alleges the ALJ failed to properly assess her limitations as required by SSR 96-8p because he failed to detail evidentiary support for each of his RFC conclusions, and failed to include limitations in his RFC accounting for Claimants "severe" hand/wrist synovitis, obesity, and anxiety/depression. Claimant also alleges the RFC determined by the ALJ is not supported by substantial evidence and contradicts opinions of her treating physician, Dr. Savapoulos. Commissioner contends substantial evidence supports the ALJ's determination of Claimant's RFC.

At step four of the sequential analysis, the ALJ must determine the claimant's RFC. 20 C.F.R § 404.1520. The RFC is what a claimant can still do despite her limitations. <u>Id.</u> at § 404.1545. More specifically, it is an assessment of a claimant's functional limitations resulting from medically determinable impairments (or combination of impairments) and includes the impact of related symptoms such as pain. SSR 96-8p (1996). The determination of a claimant's RFC is based upon all of the relevant evidence. 20 C.F.R. § 404.1545. Observations by treating physicians, psychologists, family, neighbors, friends, or other persons of Claimant's limitations may be used. <u>Id.</u> These descriptions and observations must be considered along with medical records to assist the Social Security Administration to decide to what extent an impairment keeps a claimant from performing particular work activities. <u>Id.</u> The ALJ must consider limitations

imposed by all a claimant's impairments, even those that are not "severe." SSR 96-8p. This assessment is not a decision on whether a Claimant is disabled, but is used as a basis for determining the particular types of work a claimant may be able to do despite his impairments. Id.

SSR 96-8p provides that an RFC assessment must identify the claimant's functional limitations as well as assess the claimant's ability to perform exertional and nonexertional work functions. The relevant functions are listed in 20 C.F.R. § 404.1545. The ALJ must provide a "narrative discussion describing how the evidence supports each conclusion." SSR 96-8p. In cases where pain is alleged, the ALJ must consider the medical evidence and the subjective complaints of pain, resolve any inconsistencies, and "set forth a logical explanation of the effects of the symptoms, including pain" on claimant's ability to work. Id.

The Court first finds the ALJ's analysis of Claimant's RFC complied with the mandate of SSR 96-8p that he describe how evidence supports his conclusions, evaluate the impact of Claimant's pain, and assess Claimant's mental and physical abilities to perform work-related functions. (Tr. 17-20). As detailed in his decision, the ALJ assessed the physical limitations imposed by Claimant's seizures and hand impairments and the mental limitations imposed by Claimant's anxiety/depression.[7] (Tr. 17-20). The ALJ also considered Claimant's subjective complaints and ruled the degree of symptoms alleged was not supported by the evidence. (Tr. 20).

---

[7] Contrary to Claimant's assertion, the Court finds it was unnecessary for the ALJ to document evaluation of Claimant's ability to perform every work-related function listed in 20 C.F.R. § 404.1545 - as alleged by Claimant - because such documentation would have been excessive given Claimant's minimal work-related limitations.

The Court next finds the RFC's absence of accommodation for Claimant's hand impairment and anxiety/depression is supported by substantial evidence. (Tr. 17-20, 176, 186, 195, 233, 235, 236). The medical evidence established Claimant retained full range of motion in her hands between January 2000 through February 2003 and retained the ability to play computer games and drive a car. (Tr. 44-47, 176, 186). Additionally, although the record also establishes Claimant suffered from depression and anxiety during the relevant time period, the evidence fails to establish the existence of any medical or physical limitations arising therefrom. The ALJ properly discounted Dr. Savapoulos's December 2005 Medical Questionnaire because it was completed more than two years after the relevant time period and is contradicted by his reports Claimant's anxiety and mood were improved and by two Psychiatric Review Technique reports from 2005 which report insufficient evidence prior to June 2003. (Tr. 130, 192, 212, 236).

Despite the above findings, the Court finds the ALJ's decision warrants remand because the Court is unable to determine whether the ALJ, in determining Claimant's RFC, considered the impact of Claimant's obesity on her work-related abilities (such as her ability to stand, sit, manipulate objects, and focus), and the impact of her obesity on her other impairments such as her depression. See SSR 02-1p; (Tr. 226, 231). Without being able to determine the above information, the Court cannot evaluate whether the ALJ's determination of Claimant's RFC is supported by substantial evidence. Because it is not the role of the Court to weigh the evidence, the case must be remanded for further consideration consistent with the guidelines set forth in SSR 02-1p and 20 C.F.R. Pt. 404, Subpt. P, App. 1; see Craig, 76 F.3d at 589. See Fleming v. Barnhart, 284 F. Supp. 2d at 272 (D.Md. 2003); see SSR 02-1p.

4.      Whether the ALJ Erroneously Determined Claimant Was Capable of Performing Her Past Work as a Sewing Machine Operator.

Claimant alleges the ALJ erred in concluding Claimant was capable of performing her past relevant work as a sewing machine operator. Claimant specifically alleges 1) the ALJ failed to make the three factual findings required by SSR 82-62, 2) her hand impairment rendered her unable to perform her past work as defined in the Dictionary of Occupational Titles, 3) there is not substantial evidence to support the ALJ's conclusion she retained the ability to perform her past relevant work. Commissioner argues the ALJ properly determined Claimant's RFC, properly determined her hand impairment did not limit her ability to perform her past work, and there was substantial evidence to support the ALJ's conclusion Claimant was capable of performing her past work.

In step four of the sequential analysis, the ALJ must decide whether a claimant's impairments prevent her from returning to his past relevant work. A finding the claimant can meet the physical and mental demands of her past relevant work results in a finding the claimant is not disabled. 20 C.F.R. §§ 404.1520(e), 416.920(e). "Past relevant work" is "skills and abilities that [one] has acquired through work [one] has done which shows the type of work [one] may be expected to do." 20 C.F.R. § 4040.1565(a). An ALJ's decision that a claimant is capable of performing her past relevant work must include the following findings of fact: 1) the individual's RFC, 2) the physical and mental demands of the past job/occupation, 3) the individual's RFC would permit a return to her past job or occupation. SSR 82-62.

The Court finds the ALJ failed to make the second of three factual findings required by SSR 82-62, namely a finding as to the physical and mental demands of a sewing machine

32

operator.  Although the ALJ found Claimant retained a specific RFC and Claimant's RFC permitted her to perform her past job a sewing machine operator, the ALJ insufficiently documented the demands of a sewing machine operator.  (Tr. 21).  The ALJ merely stated the job permitted an individual to sit for up to eight hours and change positions as needed, and that the machinery was not dangerous/hazardous.  (Tr. 21).  The ALJ also referenced the hearing testimony of the vocational expert that established Claimant's prior work qualified as "light and unskilled."  (Tr. 21, 51).  The Court finds the ALJ failed to make any findings as to additional physical demands such as finger manipulation and additional mental demands such as required duration of uninterrupted work.  Accordingly, the case must be remanded for further articulation of the demands of a sewing machine operator consistent with SSR 82-62.

Regarding Claimant's allegation her hand impairment rendered her unable to perform her past work, the Court disagrees and finds substantial evidence supports the ALJ's finding to the contrary.  Claimant's past work required she use her hands to pick up two pieces of material, run it over the machine, turn it over, and tie it up.  (Tr. 48).  Claimant testified that her hands began hurting her in 2000 or 2001 and they gradually got worse.  (Tr. 33-34).  The record reveals, however, Claimant was able to continue working as a sewing machine operator until December 2000 when the plant closed and that it was the sitting, not the hand manipulation, that pained her in her job.  (Tr. 48-49).  Additionally, Claimant was found to retain full range of motion in her hands and fingers in January and August 2000.  (Tr. 176, 184).  The ALJ also reasonably noted the inconsistency in Claimant's treatment records.  In September 2001, Claimant complained to Dr. Savapoulos that left arm pain limited her grip.  (Tr. 196).  He diagnosed her with "left lateral epicondylitis.  (Tr. 196).  In December 2002, however, Claimant returned to Dr. Savapoulos and

complained of pain and numbness in her right hand.  (Tr. 195).  Dr. Savapoulos diagnosed her

with "right hand pain with probably carpal tunnel syndrome."  (Tr. 195).  He gave her a splint to

wear, which Claimant testified she wore only at nights.  (Tr. 34).  In February 2003, Claimant

was diagnosed with "early synovitis" of the hand and wrist.  (Tr. 186).  However, Claimant

testified she retained the ability to drive for the Red Cross and play computer games.   (Tr. 44 -

47).

　　　Regardless of the above finding that substantial evidence supports the ALJ's decision

Claimant's hands did not preclude her from working, the Court cannot determine whether the

ALJ's ultimate conclusion as to Claimant's ability to work is supported by substantial evidence

because the ALJ did not document his consideration of Claimant's obesity.  The ALJ found

Claimant had a number of medically determinable impairments including anxiety/depression,

synovitis of the hand and wrist, history of seizure disorder, and moderate obesity.  (Tr. 17).

While the Court finds Claimant's impairments were marginally, if at all, severe and did not

prevent her from performing her past work[8], it is not the Court's role to weigh the evidence.   See

Craig, 76 F.3d at 589.  Without knowing how the ALJ weighed Claimant's obesity, particularly

it's impact on Claimant's depression, the Court cannot determine whether the ALJ's decision is

---

[8] As explained above, Claimant's hand impairment did not prevent her from performing
the physical demands of her past work.  Similarly, Claimant's "confusion" did not prevent her
from performing her past work.  A February 2000 CT scan of Claimant's head was normal and a
March 2000 neurological exam was normal.  (Tr. 170, 183).  While Dr. Savapoulos diagnosed
Claimant with "complex partial seizures" in March 2003 and "possible petit mal seizures" in
June 2004, there is no laboratory or diagnostic test in the record to support such findings nor the
symptoms of confusion alleged by Claimant.  (Tr. 193, 233); see SSR 96-7p [requiring the
claimant's symptoms to be supported by medically acceptable clinical and laboratory diagnostic
techniques]; see Craig, 76 F.3d at 585.   Likewise, there is no evidence, other than Claimant's
own testimony, of an impairment that renders Claimant unable to sit for extended periods of
time.  (Tr. 32, 34).

supported by substantial evidence. Accordingly, the case must be remanded for further consideration consistent with the guidelines set forth in SSR 02-1p and 20 C.F.R. Pt. 404, Subpt. P, App. 1 for the evaluation of obesity.

## IV. Recommendation

For the foregoing reasons, I recommend that:

1. Claimant's Motion for Summary Judgment be GRANTED because although the ALJ complied with the procedures for evaluating Claimant's mental impairment, the ALJ failed to comply with the procedures for evaluating Claimant's obesity in steps three and four of the sequential analysis. Accordingly, the Court, despite finding substantial evidence supports aspects of the ALJ's determination of Claimant's RFC and her ability to perform her past work, cannot determine whether the ALJ's decision, as a whole, is supported by substantial evidence.

2. Commissioner's Motion for Summary Judgment be DENIED for the same reasons stated above.

Any party who appears *pro se* and any counsel of record, as applicable, may, within ten (10) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection. A copy of such objections should be submitted to the District Court Judge of Record. Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation.

DATED: November 13, 2007

/s/ James E. Seibert
JAMES E. SEIBERT

35

UNITED STATES MAGISTRATE JUDGE